IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |
|---|---|
| RIOVONNI BRYANT, BRANDON MCKINNEY, EMILY PADILLA, and AZARAEL TUTMAN, *individually and on behalf of similarly situated persons* <br><br> Plaintiffs, <br><br> v. <br><br> UNIFI AVIATION, LLC, <br><br> Defendant. | CIVIL ACTION NO. <br> 1:24-cv-4141-AT |

## **ORDER**

Before the Court is Defendant Unifi Aviation, LLC's Motion to Compel Arbitration. [Doc. 5]. As explained below, Unifi's Motion is **GRANTED**. The parties are **ORDERED** to arbitrate their dispute, and this case is **STAYED** and **ADMINISTRATIVELY CLOSED** pending the outcome of the arbitration.

### I. INTRODUCTION

In this putative collective action under Fair Labor Standards Act ("FLSA"), Plaintiffs Riovonni Bryant, Brandon McKinney, Emily Padilla, and Azarael Tutman seek to recover unpaid overtime wages that they and similarly situated persons were allegedly denied due to Defendant Unifi Aviation, LLC's improper time-rounding system. *See* (Compl. Doc. 1 at 1–2).

Unifi provides wheelchair and other aviation services at Hartsfield-Jackson International Airport in Atlanta, Georgia. (*Id.* ¶¶ 1, 5). At the airport, Bryant, McKinney, and Padilla work as Unifi Customer Service Leads, and Tutman works as a Unifi Wheelchair Agent. (*Id.* ¶ 4). In these roles, Plaintiffs allege that they:

1) assist airport passengers through arrival and check-in processes; including support for passengers with special needs such as unaccompanied minors, VIP passengers and passengers needing wheelchair assistance;

2) handle all aspects of ticketing and check-in by operating a computerized system, boarding, baggage service, reservations and resolving related complaints and problems;

3) direct passengers through Customs, Immigration, and Quarantine;

4) assist Ramp Service Agents to ensure that wheelchairs, strollers, and gate-checked bags are made available for loading upon departure and delivery to passengers upon arrival;

5) operate equipment to include the jet way, computer keyboards, and carrier-specific reservation/ ticketing software; and

6) push wheelchairs with wheelchair-bound airline passengers through all areas of the Airport, including terminal and gate areas.

(*Id.* ¶ 4).

In an uncontroverted declaration, Padilla elaborates on the wheelchair services that the Wheelchair Agents and Customer Service Leads provide. *See* (Doc. 10-1). She explains that the primary job of Wheelchair Agents "is transporting passengers through the airport to their gate and onto and off airplanes operated by Delta Airlines." (*Id.* ¶ 5). And although Customer Service Leads "have additional duties, such as setting up wheelchairs at the gate and pre-

boarding wheelchairs onto the jet bridge," Padilla states that they also "fill in and perform the duties of Wheelchair Agents virtually every day." (*Id.* ¶ 6).

Based on her time working in both roles, Padilla states that Wheelchair Agents and Customer Service Leads "load and unload passengers and their baggage on and off airplanes on a daily basis." *See* (*id.* ¶ 4). She adds that "[t]he vast majority of the passengers that are loaded on and off airplanes by Wheelchair Agents and Customer Service Leads bring with them at least one piece of carry-on baggage," and that these passengers "fly interstate and international routes." (*Id.* ¶¶ 7, 8).

After Plaintiffs filed this lawsuit, Unifi moved to compel arbitration. [Doc. 5]. It argues that each of the named plaintiffs signed a Mutual Arbitration Agreement that states binding arbitration "shall be the exclusive remedy for any 'Covered Claim,'" such as FLSA claims, arising out of their employment with Unifi. *See* [*id.* at ECF 1, 5]. Plaintiffs oppose Unifi's motion. They first argue that they are "workers engaged in foreign or interstate commerce" under 9 U.S.C. § 1, and their arbitration agreements therefore cannot be enforced under the Federal Arbitration Act. *See* (Doc. 10 at 5–6). Plaintiffs next argue that they also may not be compelled to arbitrate under Georgia law because the arbitration clauses at issue were not initialed by the parties as required by O.C.G.A. § 9-9-2(c)(9). (Pl. Sur-Reply Br., Doc. 13-1 at 1–3).

3

## II.   ANALYSIS

### A.   Plaintiffs Are Not Required to Arbitrate under the FAA

#### 1.   Legal Standard

The Federal Arbitration Act requires courts to enforce private arbitration agreements. *New Prime Inc. v. Oliveira*, 586 U.S. 105, 108 (2019). Section 2 of the FAA embodies a policy favoring arbitration and places arbitration agreements on equal footing with all other contracts:

> A written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

*Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443–44 (2006) (citing 9 U.S.C. § 2).

Thus, "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration" and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Hinson v. Lyft, Inc.*, 522 F. Supp. 3d 1254, 1257–58 (N.D. Ga. 2021) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). Plaintiffs challenging the enforcement of an arbitration agreement bear the burden to establish a defense to the enforcement of the agreement. *Hinson*, 522 F. Supp. 3d at 1258 (citation omitted); *see Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 91 (2000).

Relevant here, the FAA exempts from its coverage "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or

4

interstate commerce." 9 U.S.C. § 1. "The Supreme Court has held that § 1's residual clause—'any other class of workers engaged in foreign or interstate commerce'— applies only to 'contracts of employment of transportation workers.'" *Hinson*, 522 F. Supp. at 1258 (citing *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 118–19, (2001)).

To determine whether a plaintiff falls within § 1's residual clause exemption, courts "begin by defining the relevant 'class of workers' to which [the plaintiff] belongs," before determining "whether that class of workers is 'engaged in foreign or interstate commerce.'" *See Southwest Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022). "[A] 'class of workers' is properly defined based on what a worker does for an employer, 'not what [the employer] does generally.'" *Bissonnette v. LePage Bakeries Park St., LLC*, 601 U.S. 246, 251 (2024) (quoting *Saxon*, 596 U.S. at 456). And a given class of workers is engaged in foreign or interstate commerce if it is "directly involved in transporting goods across state or international borders." *See Saxon*, 596 U.S. at 457.

2. **Discussion**

In *Saxon*, the Supreme Court was asked to determine whether a Southwest Airlines ramp supervisor whose "work frequently requires her to load and unload baggage, airmail, and commercial cargo on and off airplanes that travel across the country" was exempted from the FAA as part of a "class of workers engaged in foreign or interstate commerce." 596 U.S. at 453. The Court held that she was so exempted because "any class of workers that loads or unloads cargo on or off

airplanes bound for a different State or country is 'engaged in foreign or interstate commerce.'" 596 U.S. at 459.

The Supreme Court's unanimous opinion explained that Southwest moves three categories of cargo: "passenger, commercial, and mail cargo." *See id.* at 454. Passenger cargo includes passengers' "baggage." *See id.* In finding that Saxon's work as a ramp supervisor qualified her for § 1's residual clause exemption, it credited her uncontroverted declaration that ramp supervisors like Saxon "frequently" help Southwest's ramp agents load and unload cargo. *See id.* at 454–455, 456. The Supreme Court therefore held that it was "plain" that carrying out this work made Saxon "part of the intestate transportation of goods." *See id.* at 457.

Here, Plaintiffs argue that like the Southwest ramp agents and ramp supervisors in *Saxon*, Unifi's Wheelchair Agents and Customer Service Leads are a "class of workers that loads or unloads cargo on or off airplanes" bound for different states or countries, and that they are therefore also workers "engaged in foreign or interstate commerce." *See* 596 U.S. at 459. In support, they cite Padilla's uncontroverted declaration, which states that Wheelchair Agents and Customer Service Leads "load and unload passengers and their baggage on and off airplanes on a daily basis." *See* (Doc. 10-1 ¶ 4).

Unifi responds that the work of its Wheelchair Agents and Customer Service Leads is materially different from the ramp workers in *Saxon* because they only load and unload passengers' baggage. *See* (Def. Reply Br., Doc. 12 at ECF 3). It claims that *Saxon* did not treat passenger baggage as "cargo," and therefore,

6

Plaintiffs are not part of the interstate transportation of goods. *See* (*id.*). The Court is not persuaded by this argument. Despite Unifi's claim, *Saxon* does categorize passenger baggage as cargo—in fact, baggage is the first type of cargo that it identifies. *See Saxon*, 596 U.S. at 453–54 ("Southwest Airlines moves a lot of cargo. In 2019, Southwest carried *the baggage of over 162 million passengers* to domestic and international destinations.") (emphasis added).

Plaintiffs thus belong to a "class of workers that loads or unloads cargo on or off airplanes bound for a different State or country" and are therefore "engaged in foreign or interstate commerce." *See Saxon*, 596 U.S. at 459. As a result, Plaintiffs are exempt from the coverage of the FAA under § 1's residual clause exemption.

### B.     Plaintiffs Are Required to Arbitrate under Georgia Law

Yet this is not the end our inquiry. The choice-of-law provision in the parties' Mutual Arbitration Agreement provides, "If for any reason the FAA is held inapplicable to a question concerning this agreement, then the State of Georgia's law shall apply. (Exhibit 1 to Doc. 5-1 at 3); (Exhibit 2A to Doc. 5-2 at ECF 12). Unifi therefore argues that even if Plaintiffs are exempted from FAA coverage, they should still be compelled to arbitrate their claims under O.C.G.A. § 9-9-6(a). (Reply Br., Doc. 12 at ECF 5–6).[1]

---

[1] "Both the FAA and Georgia law provide that a party aggrieved by the failure of another to arbitrate under an agreement may apply for an order compelling arbitration in a court of competent jurisdiction." *Kaspers v. Comcast Corp.*, 631 F. App'x 779, 783 (11th Cir. 2015) (citing O.C.G.A. § 9-9-6(a); 9 U.S.C. § 4).

Plaintiffs argue that they cannot be compelled to arbitrate under Georgia law because "the arbitration clauses were not initialed as required by O.C.G.A. § 9-9-2(c)(9)." (Doc. 13-1 at ECF 1–2). That statute provides that a written agreement to arbitrate employment-related matters will be enforced only if "the clause agreeing to arbitrate is initialed by all signatories at the time of the execution of the agreement." O.C.G.A. § 9-9-2(c)(9). Upon review, the Court is not persuaded by this argument.

To start, the parties' agreement to arbitrate is not located in a clause or provision within a larger employment contract. Instead, the parties executed a separate, five-page Mutual Arbitration Agreement that extensively outlined the terms of the Plaintiffs' agreement to arbitrate "Covered Claims," including FLSA claims. *See* (Exhibit 1 to Doc. 5-1); (Exhibit 2A to Doc. 5-2). Rather than initial essentially all of the arbitration contract's individual provisions, the parties signed[2] the last page of the agreement, under declarations stating that the Plaintiffs "knowingly and voluntarily waive for any covered claim . . . the right to trial by jury or judge" and that they "understand the terms and conditions of this agreement." (Exhibit A to Doc. 5-1 at 5); (Exhibit 2A to Doc. 5-2 at ECF 13). Plaintiffs identify no authority stating that where the agreement to arbitrate is memorialized in a valid, stand-alone arbitration contract—each clause of which governs the agreement to arbitrate—Georgia law requires more.

---

[2] *See* (O'Donoghue Decl., Doc. 5-1 ¶¶ 11–13); (Sharma Decl., Doc. 5-2 ¶ 6).

8

Accordingly, Unifi's Motion, [Doc. 5], is **GRANTED**. The parties are **ORDERED** to arbitrate their dispute, and this case is **STAYED** and **ADMINISTRATIVELY CLOSED** pending the outcome of the arbitration.

**IT IS SO ORDERED** this 16th day of September, 2025.

_____
**Honorable Amy Totenberg**
**United States District Judge**